## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  13-31277

RANDY JOE PERKINS
GENEVA PERKINS

                Debtors

## MEMORANDUM ON OBJECTION TO
## CONFIRMATION OF CHAPTER 12 PLAN

**APPEARANCES:**    GRIBBLE, CARPENTER & ASSOCIATES, PLLC
                  Keith L. Edmiston, Esq.
                  118 Parliament Drive
                  Maryville, Tennessee  37804
                  Attorneys for Debtors

                  KENNERLY, MONTGOMERY & FINLEY, P.C.
                  Michael S. Kelley, Esq.
                  Rob Quillin, Esq.
                  Post Office Box 442
                  Knoxville, Tennessee  37901-0442
                  Attorneys for Farm Credit Mid-America, PCA

                  C. KENNETH STILL, ESQ.
                  Post Office Box 511
                  Chattanooga, Tennessee  37401
                  Chapter 12 Trustee

                  SAMUEL K. CROCKER, ESQ.
                  UNITED STATES TRUSTEE
                  Patricia C. Foster, Esq.
                  Howard H. Baker, Jr. United States Courthouse
                  800 Market Street
                  Suite 114
                  Knoxville, Tennessee  37902
                  Attorneys for United States Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court upon the Objection of Farm Credit Mid-America, PCA to Amended Chapter 12 Plan of Adjustment (Objection to Confirmation) filed by Farm Credit Mid-America, PCA (Farm Credit) on July 24, 2013, grounded on its treatment as a secured creditor in the Chapter 12 Plan of Adjustment of Debts of a Family Farmer With Regular Income filed by the Debtors on July 11, 2013, amended by the Amended Chapter 12 Plan of Adjustment of Debts of a Family Farmer With Regular Income filed by the Debtors on July 17, 2013.   Thereafter, on September 10, 2013, the Debtors filed a Second Amended Chapter 12 Plan of Adjustment of Debts of a Family Farmer With Regular Income (Second Amended Plan), which is the plan at issue in this contested matter.   The issues, as stated in the scheduling Order entered on August 1, 2013, are whether the Debtors are eligible to be debtors under Chapter 12 and whether their proposed plan meets the confirmation requirements of 11 U.S.C. § 1225(a)(1), (3), (5)(B), and/or (6) (2006).[1]

The trial on the Objection to Confirmation was held on September 17, 2013.   The record before the court consists of the Joint Stipulations of the Parties filed on September 10, 2013, eleven exhibits introduced into evidence, and the testimony of three witnesses, Thomas Randy Lawson, Senior Special Accounts Loan Officer with Farm Credit, and the Debtors.

This is a core proceeding.   28 U.S.C. § 157(b)(2)(L) (2006).

---

[1] Although subsection (3) was included within the original objection to confirmation, neither party addressed the good faith issue, and it has not been considered by the court.

2

# I

The Debtors filed the Voluntary Petition commencing their Chapter 12 bankruptcy case on April 3, 2013.  Mr. Perkins is a farmer and Mrs. Perkins has been employed as a secretary/bookkeeper with the Campbell County Board of Education for thirty-four years.  Both Debtors receive Social Security income totaling $1,758.00 monthly.  TRIAL EX. 10.  Mr. Perkins's farming income arises from a Cattle Grazing Contract with Diamond Feeders, LLC under which he grazes, feeds, and raises its 262 head of cattle on approximately 200 acres of leased agricultural land in LaFollette, Tennessee, and is paid $0.50 per head per day plus reimbursement for feed and minerals.  TRIAL EX. 4.  Mr. Perkins also owns thirty-seven head of cattle which he raises on a different pasture of the same leased agricultural property.  Farm Credit is a secured creditor of the Debtors by virtue of the following:  (1) a Promissory Note/Loan Agreement dated May 19, 2009, for a revolving line of credit in the principal amount of $200,000.00 secured by an Open-End Deed of Trust dated May 28, 2004, and a second Open-End Deed of Trust dated August 31, 2004, both recorded with the Campbell County Register of Deeds with respect to real property located in Campbell County, Tennessee, and a UCC-1 Financing Statement filed with the Tennessee Secretary of State on January 11, 2010, for all farm machinery and equipment, including three tractors and a harvester, and all cattle; and (2) a Promissory Note/Loan Agreement dated November 25, 2009, for a loan in the amount of $12,201.00 secured by a UCC-1 Financing Statement filed with the Tennessee Secretary of State on February 16, 2009, for all farm equipment and machinery, including three tractors and a harvester, all cattle and a 2004 8120 Featherlite Stock Trailer.  TRIAL EX. 11; TRIAL EX. 12.

3

The Debtors filed their initial Chapter 12 Plan on July 11, 2013, which they amended on

July 17, 2013, and again on September 10, 2013.  Farm Credit filed its Objection to Confirmation

on July 24, 2013, arguing that the Debtors do not qualify as family farmers under 11 U.S.C. § 109(f)

(2006) and that the Amended Plan does not satisfy the requirements of 11 U.S.C. § 1225(a).  Under

the Second Amended Plan, the Debtors propose a $2,322.57 payment by September 1, 2013, which

they made, and semi-annual payments in the amount of $22,454.25 to the Chapter 12 Trustee in

January and July of each year beginning in 2014, and continuing through 2018.  The Second

Amended Plan also provides for treatment of the following four classes:  (a) Class 1 consists of

administrative expense claims including the Chapter 12 Trustee's fee and attorneys' fees in the

amount of $2,000.00; (b) Class 2 consists of Farm Credit's claim in the amount of $208,578.02,

secured by the Debtors' residence and an adjoining lot located at 944 Hill Top Drive, Jacksboro,

Tennessee (collectively, Hill Top Drive Property), approximately forty head of cattle, three John

Deere tractors, a harvester, and farming equipment, to be paid under a ten-year amortization at 4.5%

interest through semi-annual payments of $12,970.02 with a balloon payment of all unpaid principal,

interest, and fees to be made on or before December 31, 2018; (c) Class 3 consists of Community

Trust Bank's mortgage claim in the amount of $133,947.70, secured by approximately ten acres

located at Eagle Bluff Road, Jacksboro, Tennessee (Eagle Bluff Road Property) to be paid under a

ten-year amortization at 4% interest through semi-annual payments of $8,136.96 with a balloon

payment of all unpaid principal, interest, and fees to be made on or before December 31, 2018,

although the collateral will be marketed for sale, with any surplus proceeds to be paid to Farm

Credit; (d) Class 4 consists of Discover Bank's general unsecured claim in the amount of $183.21

to be paid in full on or before September 15, 2013.  TRIAL EX. 2.  Additionally, the liens of both

4

Farm Credit and Community Trust Bank will continue through completion of the Second Amended

Plan.  The Debtors propose to fund the plan with income received through the Diamond Feeders

contract, income derived from the breeding and sale of cattle owned by Mr. Perkins, the Debtors'

Social Security benefits, and Mrs. Perkins's income from her employment with the Campbell County

Board of Education.

## II

"Only a family farmer or family fisherman with regular annual income may be a debtor under

chapter 12 of this title."  11 U.S.C. § 109(f).  Congress enacted Chapter 12, which is modeled after

Chapter 13, "in response to the agricultural debt crisis of the mid-1980s," *Traders State Bank v.*

*Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir. 1990), and in order "to

enable family farmers to retain their farms while reorganizing their financial affairs."  *In re Lockard*,

234 B.R. 484, 490 (Bankr. W.D. Mo. 1999).  "Chapter 12 is intended to 'give family farmers facing

bankruptcy a fighting chance to reorganize their debts and keep their land.'"  *In re Buchanan*, 2006

WL 2090213, at *3, 2006 U.S. Dist. LEXIS 50968 at *9 (M.D. Tenn. July 25, 2006) (quoting *In re*

*Pianowski*, 92 B.R. 225, 232 (W.D. Mich. 1988)).  "The party filing a petition under Chapter 12

bears the burden of proving eligibility."  *In re Meadows*, 2012 WL 2411905, at *2, 2012 Bankr.

LEXIS 2916, at *4 (Bankr. E.D. Ky. June 26, 2012) (citations omitted).

Farm Credit first argues that the Debtors are not eligible to be debtors under Chapter 12 and

do not fall within the scope of "family farmer" because they are not engaged in and do not derive

5

more than 50% of their income from farming operations.  The term "family farmer" is defined by

the Bankruptcy Code in material part as follows:

> The term "family farmer" means—
>
>> (A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $3,792,650 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for—
>>
>>> (i) the taxable year preceding; or
>>>
>>> (ii) each of the 2d and 3d taxable years preceding;
>>
>> the taxable year in which the case concerning such individual or such individual and spouse was filed[.]

11 U.S.C. § 101(18) (2006).  Additionally, a "'family farmer with regular income' means family

farmer whose annual income is sufficiently stable and regular to enable such family farmer to make

payments under a plan under chapter 12 of this title[,]" 11 U.S.C. § 101(19) (2006), and, under the

Bankruptcy Code, "'farming operation' includes farming, tillage of the soil, dairy farming, ranching,

production or raising of crops, poultry, or livestock, and production of poultry or livestock products

in an unmanufactured state."  11 U.S.C. § 101(21) (2006).

"The definition of 'farming operation' does not provide an exclusive list of all farming

activities and is not limited to the specific activities delineated in the statute.  'This definition is to

be construed liberally in order to further Congress' purpose of helping family farmers to continue

farming.'" *Rinehart v. Sharp (In re Sharp)*, 361 B.R. 559, 564 (B.A.P. 10th Cir. 2007) (quoting

6

*Watford v. Fed. Land Bank of Columbia (In re Watford)*, 898 F.2d 1525, 1527 (11th Cir. 1990)); *see also In re Hemann*, 2013 WL 1385404, at *5, 2013 Bankr. LEXIS 1385 at *15 (Bankr. N.D. Iowa Apr. 3, 2013) ("Courts construe this definition liberally in order to further Congress' purpose of helping family farmers to continue farming."). In determining what constitutes "farming operations," the majority of courts have adopted a "totality of the circumstances" approach in order to give credence to the "'purpose and history behind the relevant statutory law and the broad interpretation to be given to the Bankruptcy Code in general.'" *Buchanan*, 2006 WL 2090213, at *3-4, 2006 U.S. Dist. LEXIS 50968 at *9 (quoting *In re Armstrong*, 812 F.2d 1024, 1026 (7th Cir. 1987)). "Farming operations are generally held to be those activities that subject the debtor to the risks traditionally associated with farming." *In re Powers*, 2011 WL 3663948, at *1, 2011 Bankr. LEXIS 3180, at *2-3 (Bankr. N.D. Cal. Aug. 12, 2011). Under the "totality of the circumstances" test, some of the relevant factors include:

> (1) whether the location of the operation would be considered a traditional farm; (2) the nature of the enterprise at the location; (3) the type of produce and its eventual market; (4) the physical presence or absence of family members on the farm; (5) ownership of traditional farm assets; (6) whether the debtor is involved in the process of growing or developing crops or livestock; and (7) whether or not the practice or operation is subject to the inherent risks of farming.

*See In re Jones*, 2011 WL 3320504, at *2-3, 2011 Bankr. LEXIS 2982 at *8-9 (Bankr. D. Or. Aug. 2, 2011) (quoting *In re Sugar Pine Ranch*, 100 B.R. 28, 31 (Bankr. D. Or. 1989)); *In re Teolis*, 419 B.R. 151, 156 (Bankr. D.R.I. 2009). Additionally, "[t]he relevant date for determining whether a debtor is 'engaged in a farming operation' is the date the Chapter 12 petition is filed." *Hemann*, 2013 WL 1385404, at *5, 2013 Bankr. LEXIS 1385 at *14.

7

Notwithstanding Farm Credit's arguments to the contrary, the court finds that Mr. Perkins is engaged in farming operations for the purposes of Chapter 12. At trial, Mr. Perkins testified that, pursuant to the Cattle Grazing Contract, he personally cares for 262 head of cattle owned by Diamond Feeders by feeding them daily and providing them with minerals every three days. In order to house and graze the cattle, Mr. Perkins leases approximately 200 acres of agricultural land in LaFollette, Tennessee, and he testified that not only is he attempting to lease additional land but also that he hopes to take on additional cattle from Diamond Feeders. The fact that he is caring for these cattle on leased land is irrelevant in the determination of whether his work constitutes farming operations, as is the fact that he does not personally own the majority of the cattle he cares for. Although he is not the owner of those cattle, Mr. Perkins performs the physical labor associated with their care. *See, e.g., In re Voelker*, 123 B.R. 749, 751 (Bankr. E.D. Mich. 1990). He is responsible for the cattle, bears the inherent risks associated with caring for and raising them, and suffers losses – along with Diamond Feeders – if anything goes wrong with the cattle both in terms of a loss in income based on each head of cattle as well as the possibility that Diamond Feeders will terminate the Cattle Grazing Contract. Similarly, even though Mr. Perkins does not house and care for the cattle on property he owns, he is nevertheless responsible for making the annual lease payments totaling $9,800.00 and maintaining the land upon which he houses the cattle. Furthermore, Mr. Perkins testified that he personally owns thirty-seven head of cattle which he also cares for and hopes to breed and sell for food. Although he has not entered into a contract for a bull or any arrangement with a veterinarian for artificial insemination, Mr. Perkins testified that he has made arrangements with one of his neighbors for the use of two bulls and that he has, in the past, sold

8

cattle as well as hay. The court finds that these activities sufficiently constitute farming operations for the purposes of Chapter 12 eligibility.

Farm Credit also argues that the Debtors are not eligible under Chapter 12 because they did not derive at least 50% of their income from farming operations in 2012 or in 2010 and 2011, as required by § 101(18)(A). With respect to this argument, the court must examine the gross income received by the Debtors during the relevant tax year and determine the portion attributable to farming operations. *See In re DeGour*, 478 B.R. 1, 5 (Bankr. C.D. Cal. 2012).

> Two tests have been employed by bankruptcy courts when examining [a] debtor's income for the purpose of determining what percentage of that income is from farming. The first test looks at the extent to which the income in question bears a relationship to the debtor's farming activities prescribed by the words of the statute. Under this test, courts use the definition of gross income found in the Tax Code at 26 U.S.C. § 62(a), and then determine what percentage of that gross income is derived from farming operations . . . . Other courts have found the definition of "gross income" in the Tax Code too rigid for use in bankruptcy cases and have employed a more flexible approach. The second test examines the circumstances around the debtor's income in order to achieve an equitable result.

*Sharp*, 361 B.R. at 564 (internal citations omitted). The *DeGour* court discussed both tests before finding the majority view – importing the Tax Code's definition of gross income – to be more persuasive. *DeGour*, 478 B.R. at 5. In so finding, the court acknowledged that the gross income guidelines outlined in the Tax Code provided a reliable mechanism to answer the question whether a debtor was a family farmer under the Bankruptcy Code and additionally held that

> [c]ontrary to the Debtors' argument, using the Tax Code definition of "gross income" does allow a court to consider the totality of the circumstances in determining eligibility, including in the assessment of whether debtors are engaged in farming operations and what portion of their debt arises out of farming operations. Section 101(18)(A) even permits debtors to meet the "farm income" test for the second and third taxable years before the petition date if they cannot meet the test for the taxable

9

year immediately before the petition date, which again permits flexibility in
establishing eligibility while giving the inquiry a needed level of certainty.

*DeGour*, 478 B.R. at 6.

In support of the argument that their farming income exceeded income from other sources
for the two years preceding the filing date, the Debtors introduced into evidence as Collective Trial
Exhibit 5 their federal tax returns for 2011 and 2012.  "Section 61(a) [of the Tax Code] provides that
gross income includes, among other things, compensation for services, interest, and dividends[ and
s]ection 86 requires the inclusion in gross income of up to 85% of Social Security benefits received."
*Clayton v. Comm'r*, 2012 WL 2741356, at *1 (T.C. July 8, 2012).  The Debtors' tax return for 2012
reflects wages, salaries, and tips of $20,295.00 and non-taxable Social Security benefits in the
amount of $22,167.00.[2] COLL. TRIAL EX. 5.  The Debtors' Schedule F - Profit or Loss From Farming
for 2012, however, reflects gross farming income of only $17,558.00.  COLL. TRIAL EX. 5.  Based
upon their tax returns, the Debtors' gross income from farming operations for 2012, which was less
than their wages, salaries, and tips alone, without even taking into account their Social Security
benefits,[3] did not represent at least 50% of their total gross income for 2012, and the Debtors do not
meet the § 101(18)(A)(i) definition of family farmer.

Under § 101(18)(A)(ii), the court examines the Debtors' gross income for the two years
preceding the year before they filed, i.e., 2010 and 2011.  As reflected in their 2011 return, the

---

[2] The Social Security benefits are listed in line 20a of the Debtors' 2012 tax return, but because none of the
benefits are listed as taxable on line 20b, they are not included within the Debtors' total income listed in line 22. COLL.
TRIAL EX. 5.  Because the Social Security benefits are, for whatever reason, not factored into the Debtors' gross income,
the court has chosen not to include it in the 50% income analysis because it makes no difference in the outcome.  The
result is the same.

[3] *See supra* n.2.

10

Debtors' wages, salaries, and tips totaled $18,620.00, they earned non-taxable Social Security benefits in the amount of $20,353.00,[4] and their 2011 Schedule F - Profit or Loss From Farming reflects gross farm income of $79,162.00. COLL. TRIAL EX. 5. At trial, Mr. Perkins testified that his 2011 farming income figure represented cattle that he bought and sold, hay that he sold, and income received pursuant to a contract with Young Livestock for the care and maintenance of cattle. The $79,162.00 farming income clearly exceeds the total of the Debtors' other income and represented more than 50% of their gross income for 2011. Additionally, although the Debtors' tax return for 2010 was not produced at trial, Mr. Perkins testified that he did not earn any Social Security income in 2010. Mrs. Perkins testified that she drew Social Security for only a couple of months in 2010, but that the Debtors had earned approximately $27,000.00 in 2010 from their farming operations, in addition to the income that she earned from her employment with the Campbell County Board of Education, which would have been approximately the same as the $18,620.00 that she earned in 2011. Because the Debtors' testimony and evidence concerning their income for 2010 was not refuted by Farm Credit and reflects that they earned at least 50% of their gross income from farming, the Debtors have established that at least 50% of their gross income for 2010 and 2011 was derived from farming operations. Accordingly, the Debtors fall within the scope of § 101(18)(A)(ii) and qualify as debtors eligible to file under Chapter 12.

### III

Farm Credit has also objected to confirmation of the Debtors' Second Amended Plan, arguing that it does not propose proper value and is not feasible. Confirmation of a Chapter 12 plan

---

[4] *See supra* n.2.

11

is governed by 11 U.S.C. § 1225, which, as material to the resolution of this contested matter,

provides:

> (a)  Except as [otherwise] provided . . ., the court shall confirm a plan if—
>
>> (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
>>
>> . . .
>>
>> (5) with respect to each allowed secured claim provided for by the plan—
>>
>> . . .
>>
>>> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>>>
>>> (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; [and]
>>
>> . . .
>>
>> (6) the debtor will be able to make all payments under the plan and to comply with the plan[.]

11 U.S.C. § 1225(a).

## A

Farm Credit first objects to confirmation under § 1225(a), arguing that the Second Amended

Plan does not comply with subsection (5)(B) because the Debtors' proposed treatment does not

provide Farm Credit with the present value of its claim.  Courts have held, generally, that "claims

secured by real estate can be stretched out the longest." *In re Richards*, 2004 WL 764526, at *4,

2004 Bankr. LEXIS 388, at *12 (Bankr. N.D. Iowa Apr. 2, 2004).  Section 1225(a)(5) "applies not

only to long-term debts but to short-term debts that have matured prior to the commencement of the case[,]" whereby debtors may propose a Chapter 12 plan which restructures a loan obligation extending beyond the length of the plan. *In re Torelli*, 338 B.R. 390, 394 (Bankr. E.D. Ark. 2006); *see also In re Yett*, 2003 WL 25273832, at *3, 2003 Bankr. LEXIS 2250, at *11 (Bankr. D. Idaho Apr. 2, 2003) ("Decisional law recognizes that fully matured obligations may be restructured over several years under a chapter 12 plan."), *aff'd by Wells Fargo Bank NW, N.A. v. Yett (In re Yett)*, 306 B.R. 287 (B.A.P. 9th Cir. 2004). Nevertheless, "'[v]alue' must be determined objectively. Simply because a creditor subjectively would not extend a mortgage on the same terms does not mean that objectively the mortgage does not have a given value." *Travelers Ins. Co. v. Bullington*, 878 F.2d 354, 358 (11th Cir. 1989).

"Balloon payments are commonly part of chapter 12 plans[, and c]ourts that have considered balloon payments, and the need to refinance to make those payments, have looked at the probability of successfully refinancing, particularly by evaluating the existing equity in the property and projected equity at the time of refinancing." *In re Field*, 2005 WL 3148287, at *8, 2005 Bankr. LEXIS 2343, at *28 (Bankr. D. Idaho Oct. 17, 2005); *see also Euerle Farms, Inc. v. State Bank (In re Euerle Farms, Inc.)*, 861 F.2d 1089, 1090 (8th Cir. 1988) (holding that the debtor's income and expenditure projections that were so inconsistent with past performance indicated no possibility that such projections could be met and did not offer realistic expectations that the debtor would be in a position to make balloon payments from future income). Those factors notwithstanding, historical data is highly instructive for evaluating a plan's "doability," *In re Howard*, 212 B.R. 864, 880 (Bankr. E.D. Tenn. 1997), and plans including a balloon payment are highly scrutinized and

oftentimes not confirmed "unless there is proof of circumstances likely to produce a bucket of cash at just the right time to make the payment." *In re Michels*, 301 B.R. 9, 17 (Bankr. N.D. Iowa 2003) (internal citations omitted).

Additionally, § 1222(c) very clearly places a five-year limitation upon the length of a Chapter 12 plan, except as provided in subsections (b)(5) and (b)(9), which allow for the extension of a plan beyond that date in order to cure a default and/or for maintenance payments on claims for which the final payment is due after the plan duration, and the latitude to extend payments beyond five years "is one of the Code's 'most significant' provisions affecting secured creditors in Chapter 12." *In re Elk Creek Salers, Ltd.*, 286 B.R. 387, 391 (Bankr. W.D. Mo. 2002). "[T]he test is simply whether, as of the effective date of the plan, the present value of the property distributed – i.e., the new thirty-year mortgage – is equal to or greater than the amount of the allowed secured claim." *Bullington*, 878 F.2d at 357.

Farm Credit argues that the Debtors are not proposing to pay the present value of their claim. As previously stated, the Second Amended Plan provides for semi-annual payments of $22,454.25 in January and July beginning in 2014, and continuing through 2018, and payment of Farm Credit's aggregate secured claim of $208,578.02 under a ten-year amortization at 4.5% interest through semi-annual payments of $12,970.02, together with any excess proceeds from the sale of their interest in the Eagle Bluff Road Property, followed by a balloon payment of all unpaid principal, interest, and fees to be paid on or before December 31, 2018. TRIAL EX. 2. The Second Amended Plan also provides, and the parties have stipulated, that Farm Credit will retain its lien throughout the plan. TRIAL EX. 2. In support of the Second Amended Plan, the Debtors argue that they need a five year

14

plan rather than the preferred three years in order to bring their principal debt down to a level where they can reasonably refinance and make the proposed balloon payment of approximately $123,817.16.[5] They also argue that even though the value of their assets is less than the amount of Farm Credit's claim, because they are paying it in a relatively short ten-year amortization, the deferred payments exceed the present value of the claim.

Based upon the record, the court agrees that the Second Amended Plan does not adequately provide present value to Farm Credit and does not satisfy the requirements of § 1225(a)(5).  Farm Credit filed two secured proofs of claim in an aggregate amount of $208,578.02 which is secured by the Hill Top Drive Property, cattle, and machinery and equipment, including three tractors, a trailer, and a harvester.  TRIAL EX. 11; TRIAL EX. 12.  The Second Amended Plan proposes to pay the entire aggregate claim at 4.5% under a ten-year amortization, whereby Farm Credit will, prior to the balloon payment, receive a total of $86,105.96 in principal reduction.  In their Schedule A, the Debtors valued the Hill Top Drive Property at $112,000.00 and the adjoining lot at $25,000.00, and in Schedule B, they valued their cattle at $30,000.00, the tractors at $28,000.00, the harvester at $6,000.00, the farming implements at $16,000.00, the feed and supplies at $2,000.00, and hay at $1,000.00 for a total of $220,000.00.  COLL. TRIAL EX. 1.  Under the terms of the Second Amended Plan, Farm Credit will retain its liens throughout the plan; however, the value of the collateral only exceeds Farm Credit's total claim by $11,421.98 and provides for a balloon payment of at least

---

[5] In his pretrial brief, Debtors' counsel argues that at the end of the five year plan the balloon payment due Farm Credit would approximate $110,000.00.  However, as established by Trial Exhibit 6, after the final semi-annual payment is made on or before July 1, 2018, the principal balance will be $121,092.56.  Because additional interest will accrue between July 1 and December 31, 2018, the day at which the balloon payment will be due, the court will accrue that interest at the constant rate of $454.10 during each month of the six-month period pending payment of the December 31, 2018 balloon.  Accordingly, the balloon payment will approximate $123,817.16, inclusive of the principal balance of $121,092.56 as of July 1, 2018, and accrued interest of $2,746.60 as of December 31, 2018.  TRIAL EX. 6.

$123,817.16 without any additional security pledged. Moreover, the amount of the claim does not include Farm Credit's attorneys' fees, to which it is entitled under the Promissory Notes.

The proposed treatment in the Second Amended Plan likewise does not provide for an appropriate rate of interest because it does not include a sufficient risk factor as required by *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951, 158 L.Ed.2d 787 (2004). Under *Till*, the analysis "begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate." *Till*, 541 U.S. at 484-85. Accordingly, the starting point is the prime rate of interest, which is then adjusted according to the risk of default, and "the parties' original contract rate of interest is irrelevant." *In re Hudson*, 2011 WL 1004630, at *6, 2011 Bankr. LEXIS 1010, at *17 (Bankr. M.D. Tenn. Mar. 16, 2011) (citing *In re Riley*, 428 B.R. 757, 765 (Bankr. N.D. Ohio 2010)). In determining the risk factors, the court must consider "(1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement." *Till*, 541 U.S. at 484. Although the Supreme Court did not endorse a percentage range for risk, "other courts have generally approved adjustments of 1% to 3%." *Hudson*, 2011 WL 1004630, at *7, 2011 Bankr. LEXIS 1010, at *17 (quoting *Till*, 541 U.S. at 480). As of the September 17, 2013 trial date, the prime rate of interest was 3.25%. Accordingly, risk factors of one to three percent should be applied, whereby a minimum proposed interest rate should be 4.25% and a maximum should be 6.25%. Although the Second Amended Plan proposes 4.5% interest, under the *Till* analysis, that rate of interest is insufficient based upon the probability that the Debtors will

16

not be able to properly fund the Second Amended Plan, the "at will"[6] Cattle Grazing Contract with

Diamond Feeders, the significant potential for collateral depreciation, and the administrative costs

that would be incurred by Farm Credit in the event it was forced to liquidate the collateral.

First, the court does not believe that the Debtors will be able to sustain and fund the Second

Amended Plan with their current income and expenses.  The Debtors propose to fund the Second

Amended Plan through one $2,322.57 payment in September 2013, which they made, followed by

ten semi-annual payments of $22,454.25 in January and July of each year through 2018, and a final

balloon payment by December 31, 2018, to Farm Credit and Community Trust Bank for any

outstanding amounts owing on their secured claims, with an additional potential payment to occur

in the event the Debtors sell the Eagle Bluff Road Property and realize any surplus over the

$133,947.70 secured claim owed to Community Trust Bank.  TRIAL EX. 2.  The Second Amended

Plan provides, and Mr. Perkins testified, that the source of the payments will be the grazing and care

of cattle under the Diamond Feeders contract, the breeding and sale of his own cattle, the Debtors'

Social Security benefits, and Mrs. Perkins's employment with the Campbell County Board of

Education.

The proposed treatment of creditors – with the semi-annual payments and balloon payment –

assumes that the Debtors will be able to make cash payments totaling $44,908.50 each year between

2014 and 2018, and that the Debtors will be able to make a balloon payment of at least $123,817.16

---

[6] *See infra* n.8.

17

to Farm Credit, *see* TRIAL EX. 6, and to Community Trust Bank of approximately $74,184.06.[7]  The record does not, however, support the Debtors' proposals with respect to their ability to fund the plan.  The Debtors' 2011 and 2012 tax returns reflect adjusted gross income of $14,517.00 and negative $35,640.00, respectively.  COLL. TRIAL EX. 5.  The wages, salaries, and tips for each year were $18,620.00 and $20,295.00, Social Security benefits were $20,353.00 and $22,167.00, respectively, and gross farm income for both 2011 and 2012 were losses: negative $1,207.00 in 2011 and negative $56,015.00 in 2012.  COLL. TRIAL EX. 5.  Additionally, the farming income included income received from a contract with Young Livestock through which Mr. Perkins split the profit for cattle that he had cared for when they were sold, but his current contract with Diamond Feeders, which comes to $3,930.00 per month before reimbursement of expenses, does not include that same type of shared profit and results in $47,160.00 annually.[8]  Assuming that the income Mrs. Perkins will earn from the Campbell County Board of Education is approximately the same as it was in 2012, and that the Debtors' Social Security benefits will be approximately the same, the Debtors' actual income for 2013, before any losses and notwithstanding any changes, should be approximately $89,622.00, from which they would be required to make cash payments to the Chapter 12 Trustee totaling $44,908.50, leaving $44,713.50.  From this amount, the Debtors must pay their regular monthly expenses of $1,876.00, as reflected in their Schedule J, *see* COLL. TRIAL EX. 1, as well as the farming expenses, including rent of approximately $9,800.00 per year for the agricultural land upon which Mr. Perkins grazes and maintains his and Diamond Feeders's cattle, leaving

---

[7] The Second Amended Plan proposes semi-annual payments of $8,136.96 calculated at 4% over a ten-year amortization, resulting in a balloon payment on December 31, 2018.  TRIAL EX. 2.

[8] Additionally, Mr. Perkins's Cattle Grazing Contract with Diamond Feeders is terminable at will, subject to fourteen days' notice.  *See* TRIAL EX. 4.

18

approximately $12,401.50.  This figure, however, does not include additional farming expenses which, as reflected in the 2011 and 2012 tax returns, totaled $80,369.00 and $73,573.00, respectively.  COLL. TRIAL EX. 5.  Additionally, the Second Amended Plan does not provide any information regarding the Debtors' plan for funding the balloon payment of $123,817.16 to Farm Credit in December 2018, nor did the Debtors offer any testimony regarding a potential source of funding.

With respect to making up any deficiency in income, Mr. Perkins testified that the Second Amended Plan contains a provision whereby he will pay any excess proceeds from the sale of the Eagle Bluff Road Property, which he owns jointly with his sister, to Farm Credit.  Upon cross-examination, Mr. Perkins elaborated, explaining that the Eagle Bluff Road Property has been on the market for approximately six months with a listing price of $310,000.00 but there have been no contracts offered on the property thus far.  When further questioned about this provision in the Second Amended Plan, Mr. Perkins testified that if it is sold, after the lien to Community Trust Bank is paid in full, he intends to pay approximately 80% of his one-half interest in the property to Farm Credit.  Mr. Perkins also testified that he is working on leasing another 200 acres so that he can take on additional cattle from Diamond Feeders and that he is making arrangements with his neighbor for the use of two bulls in order to breed his own cattle for sale and for food in order to have a back-up plan in the event anything goes wrong with the Diamond Feeders Cattle Grazing Contract.  On cross-examination, however, Mr. Perkins acknowledged that he does not currently have a lease for any additional acreage, that he has not bought a bull or entered into a contract for the use of a bull in order to breed his cattle, and that he has not made any arrangements with a veterinarian to

19

artificially inseminate the cattle.  He also acknowledged that breeding requires a two year minimum considering the gestational period and the time within which the cattle would need to grow in order to weigh 500 to 600 pounds for sale and that the best case scenario for breeding would net him approximately $24,000.00.  These figures are simply insufficient to support a high probability that the Second Amended Plan will pay out as proposed, and the proposed 4.5% interest rate does not adequately provide Farm Credit with the present value of its claims due to this risk factor.

The Second Amended Plan likewise does not take into account any depreciation of the collateral, including death of the cattle, even though Mr. Perkins testified that he owned 281 head of cattle in November 2009, but due to the loss of many from disease and the loss of some to a customer who did not pay, he only owned forty when he filed for bankruptcy in April 2013, and that number was, as of the September 17, 2013 trial date, down to thirty-seven.  This risk of loss significantly lowers the value of Farm Credit's security interest in the Debtors' cattle and presents a significant risk factor that has not been addressed and has not been considered in calculation of the proposed interest rate.  Additionally, as testified to by Mr. Lawson, the collateral could be liquidated within a couple of months based upon current market trends; however, the values that Farm Credit would potentially receive would be lowered based upon the time and method of disposition; i.e., a short sale would yield a lower value than would a market sale, the value of any property sold at auction would be reduced by a fee of 10-18%, and the value of any cattle sold to a stockyard would include fees to both a handler and the stockyard itself.  Farm Credit would also incur direct administrative costs in liquidating the property through foreclosure and replevin, including appraisal costs, advertising costs, attorneys' fees, and the costs of obtaining writs of possession for equipment,

machinery, and cattle.  Given the inherent and obvious risks associated with the Debtors' Second

Amended Plan, the court finds that an added risk factor of 2.50% is appropriate thus requiring a total

interest rate for Farm Credit's claim of 5.75%.

**B**

Farm Credit also objects to the Second Amended Plan on the basis that it is not feasible.

Feasability "is fundamentally a factual question since it necessarily depends upon a determination

of the reasonable probability of a payment." *Howard*, 212 B.R. at 878.  In order to be confirmed,

a plan must be feasible, and courts will only approve plans that have "a rational likelihood of

success." *Michels*, 301 B.R. at 17.  "Feasibility involves considerations of the probability of

payment based upon a determination of reasonableness." *In re Ellis*, 478 B.R. 132, 139 (Bankr.

N.D.N.Y. 2012).  When making a feasibility determination, a debtor's proposed plan payments must

be analyzed in light of projected income and expenses in order to ascertain whether the debtor has

a likely ability to make all payments required under the plan.  *Elk Creek Salers, Ltd.*, 286 B.R. at

396.  "Technical feasibility, alone, however, is insufficient.  The plan must also be realistic; the

debtors must be able to do what they are proposing." *Howard*, 212 B.R. at 880.  Additionally,

feasibility must be considered in cases where a plan proposes to pay present value under

§ 1225(a)(5)(ii) "because there must be a likelihood that the debtor has sufficient disposable income

to pay the claim as required by the Code." *Torelli*, 338 B.R. at 397.

The Debtors bear the burden of proof that their Second Amended Plan is feasible; however,

"[b]ecause the purpose of Chapter 12 is to promote the reorganization attempts of family farmers,

21

courts generally give debtors the benefit of the doubt on the issue of feasibility, provided a reasonable probability of success is established." *Lockard*, 234 B.R. at 492.  They are not required to guarantee "the ultimate success" of their plan "but only to provide a reasonable assurance that the plan can be effectuated, and that reasonable assurance must rise above 'bare agronomic feasibility.'" *In re Wilson*, 378 B.R. 862, 891 (Bankr. D. Mont. 2007) (quoting *Miller v. Nauman (In re Nauman)*, 213 B.R. 355, 358 (B.A.P. 9th Cir. 1997)).  "Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are any visionary promises.  The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Lockard*, 234 B.R. at 492 (quoting *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985)); *see also Michels*, 301 B.R. at 17 ("A plan projecting a marked increased in profitability with no explanation of the cause is not confirmable."); *Howard*, 212 B.R. at 879 (holding that feasibility "must be based on objective facts rather than wishful thinking.").

Farm Credit argues that the Debtors' Second Amended Plan is not based upon objective facts but upon wishful thinking, and, as explained in the foregoing analysis with respect to the *Till* risk factors, the court agrees that the Second Amended Plan is too speculative and, therefore, unfeasible. Although the court finds Mr. Perkins credible and believes that he and Mrs. Perkins have good intentions with respect to funding the Second Amended Plan, the fact remains that, based upon the numbers alone, the Debtors cannot sufficiently fund the plan to make all payments required thereunder, and their plans for supplementing their current income sources with additional funds are simply too speculative to convince the court with any degree of certainty that the Second Amended

Plan will be funded, that the Debtors will be able to make the balloon payments required in December 2018, and that the creditors will be paid as provided for therein.

## IV

In summary, the court finds that the Debtors are "family farmers" under the Bankruptcy Code's definition; however, notwithstanding the Debtors' eligibility under Chapter 12, the Second Amended Plan does not meet the confirmation requirements of 11 U.S.C. § 1225(a)(5)(B) and (a)(6), and confirmation of the Debtors' Second Amended Plan will accordingly be denied.

An Order consistent with this Memorandum will be entered.

FILED:  October 30, 2013

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

23